FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2004 APR -5  AM 7: 33

LORETTA G. WHYTE
CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**BLANCHARD AND COMPANY, INC., ET AL**          **CIVIL ACTION**

**VERSUS**                                     **NO. 02-3721**

**BARRICK GOLD CORPORATION, J.P. MORGAN**       **SECTION "C" (3)**
**CHASE & CO. AND ABC COMPANIES**

### ORDER AND REASONS

On March 26, 2004, the matter of defendants' Motion for a Protective Order came on for

hearing before the undersigned Magistrate Judge.

Present were: Stephen H Kupperman on behalf the plaintiffs, Blanchard and Company, Inc.,
Herbert Davies and James F. Holmes;
Edward Schwartz and David Radlauer on behalf of defendant Barrick Gold
Corporation; and
Paul Spagnoletti and Amelia Koch on behalf of J. P. Morgan Chase & Co.

For the following reasons, the defendants' motion is GRANTED IN PART and DENIED IN

PART as more specifically discussed below.

### I. BACKGROUND
#### A. The Parties

The plaintiffs in this action are: (1) Blanchard and Co, Inc. ("Blanchard"), a retailer dealer

in rare coins and precious metals; (2) Herbert Davies ("Davies"), an individual investor in gold;

and (3) James F. Holmes ("Holmes"), a partner in a gold mining enterprise.  Intervenors' claims

were dismissed [1]

DATE OF ENTRY
APR - 5 2004

_____

[1]*See* Order and Reasons dated September 3, 2003 [Rec. Doc. No. 85].

Fee_____
Process____
X /Dktd_____
___ CtRmDep___
___ Doc. No. 113

1

The defendants are: (1) Barrick Gold Corporation ("Barrick"), one of the largest gold mining companies in the world; (2) J.P. Morgan Chase & Co. ("JP Morgan"), one of the largest banking companies in the United States;  and (3) ABC companies - unnamed gold bullion banks.

### B. Procedural Background

Plaintiffs' antitrust claim is generally that the defendants unlawfully combined and conspired to actively artificially manipulate the price of gold, monopolize the market in gold and cause antitrust injury to Davies as an investor, to Blanchard as a retailer and competitor, and to Holmes as a partner in a gold mining enterprise, all in violation of 15 U.S.C. §§ 1 & 2.  More particularly, plaintiffs allege that Barrick's "Premium Gold Sales Program," unlike ordinary hedging programs, is a purposeful and unlawful mechanism to manipulate the price of gold both upwards and downwards.  The mechanics of such program entails (1) JP Morgan and other bullion banks, acting on Barrick's behalf and at Barrick's direction, borrow contractually specified amounts of gold from a central bank and physically sell the gold into the spot market: (2) money from the spot market is then invested by  JP Morgan; (3) JP Morgan pays the central bank a gold lease rate (a percentage lower than that earned by capital generated from the spot sale, with the interest premium being profit for Barrick); (4) at some future date, Barrick delivers gold to JP Morgan; and  (5) JP Morgan returns the gold to the central bank.

Plaintiffs claim that the extraordinary favorable terms of the "spot-deferred sales contract" are only available to Barrick and to none of its competitors.  Essentially, the plaintiffs claim is that Barrick's Premium Sales Program is unique, no other gold producer has the combination of margin-free hedging and flexible delivery dates available, and that in combination with bullion banks such as JP Morgan, Barrick, alone among gold mining companies, is in a position to

2

manipulate the price of gold at will.

Under the "spot-deferred sales contract," JP Morgan allegedly permits Barrick to defer repayment of the borrowed gold and waives the requirement for margin. Plaintiff further claims that, as a result, while other short sellers have to cover or add additional margin when the price of gold goes up, Barrick's prearranged derivative contracts give it the ability to add to its short positions at the higher prices.

Barrick allegedly artificially manipulates the price of gold upward by reducing its short positions, adding demand or reducing supply, by bolstering the market with negligent or deliberately false bullish prognoses regarding its intent with respect to short positions and knowingly sponsoring false statistical data with respect to the gold market and its own trading activities. Plaintiffs allege that Barrick manipulates the price of gold downward by injecting massive amounts of additional supply through its short sales.

Plaintiff further alleges that, for its part, JP Morgan profits as the largest holder of gold derivatives in the United States. A "derivative" is a bilateral contract whose value is derived from the value of the underlying asset, reference rate or index. In the case of "gold derivative" that includes any predominantly paper product whose value is directly or indirectly dependent on the price of gold. The allegations include that Barrick's ability to influence the price of physical gold can produce phenomenal profits for JP Morgan.

Although an atypical case, the district judge noted that gold is an atypical product and that investors in gold are not typical consumers. Assuming the allegations were true, the district judge found both antitrust injury and standing. The Court further determined that plaintiffs' complaint sufficiently alleges an anti-competitive scheme (*i.e.*, Barrick's attempted acquisition of

3

monopoly power in the gold mining market and Morgan's attempted acquisition of monopoly

power in the gold derivatives market). The district judge further observed that the fact that the

corporate entities operate in differentiated markets makes their combination no less actionable

and that, as alleged, the Premium Gold Sales Program is nothing but a specific agreement to fix

prices involving an extraordinary commodity and atypical consumers, whose interests are not

advanced by falling prices.

In addition to the plaintiffs' claims pursuant to The Clayton Act, plaintiffs also allege that

the defendants have engaged in unfair trade practices in violation of the Louisiana Unfair Trade

Practices and Consumer Protection Law ("LUPTA"), La.Rev.Stat. 51:1401, et seq. Only the

LUPTA claim against Barrick survived the defendants' motions to dismiss. The Court dismissed

plaintiffs' LUPTA claims as against the defendant, J.P. Morgan, having found that J.P. Morgan,

as a financial institution regulated by other authority, is expressly exempt for the Act. *See* Order

and Reasons, dated September 3, 2003 at p. 28.

Plaintiffs' defamation, libel and slander claims, as well as Intervenors' analogous claims

against Barrick, were dismissed. *Id.* at pp. 34-35.

## II. CONTENTIONS OF PARTIES GENERALLY

Defendants highlight that the plaintiffs seek in discovery the defendants' most sensitive,

confidential and proprietary business information, claiming that it is relevant to their antitrust

claim. As examples of highly sensitive and propriety information and documents sought,

defendants listed the following, to wit: confidential terms of gold trades, confidential/proprietary

commercial and highly competitive contractual arrangements (*i.e.*, credit agreements with non-

party banks), confidential strategic planning information set forth in the Minutes of Barrick's

4

Board of Directors and Finance Committee Meetings and customer lists.

Defendants' protection concerns are fueled, in part, by the fact that, at the outset of the litigation, Blanchard engaged in a widespread marketing and public relations campaign built around this litigation. Defendants contend that one of Blanchard's motivations is clear – *i.e.*, to use the litigation and facts it learns to sell more gold.  In this vein, defendants refer to a press release, a website set up to provide ongoing information, direct mail campaigns and nationwide radio advertisements on the Rush Limbaugh show on Friday, May 9, 2003.  Defendants find Blanchard's proclaimed intent to publicize facts it learns from this litigation particularly distressing.   One website posts the headline, "Blanchard Moves into Discovery," and instructs, "Sign Up to be Notified of New Information Via E-MAIL."  Defendants note that Blanchard's account representatives wrote directly to prospective customers about the litigation.

Defendants seek to ensure that their most highly confidential and proprietary information produced in discovery does not make its way into the public domain and into the hands of their competitors.  A key concern that figures prominently in the protective order sought by Barrick is the fact that disclosure will be made to two self-proclaimed competitors of Barrick and JP Morgan.  Defendants submit that the disclosure of this highly sensitive information to the public or to employees of the plaintiffs would result in undue harm and extreme prejudice to the defendants.

For all of the above reasons, Defendant seek protection under terms and conditions which they contend will permit the requisite disclosure and conduct of the litigation and also provide the defendants all reasonable assurances that such information will only be used for the conduct of the litigation. Barrick has submitted a proposed order attached hereto as Court Exhibit "A".

The plaintiffs have submitted a proposed Protective Order of their own (attached hereto as Court Exhibit "B") and contend that defendants' proposed order stretches far beyond what is appropriate and necessary to protect material deemed confidential in this matter. Plaintiffs submit that the disputed provisions, which are addressed below, are a blatant attempt to control and unfairly monitor nearly every aspect of the plaintiffs' prosecution of this case and that such unprecedented control over their prosecution of this antitrust case should not be sanctioned by this Court.

Plaintiffs note that they have no objection to blanket protection of confidential material and have similarly proposed such an order to expedite the discovery in this case; however, they object to certain allegedly onerous terms as the need for such terms has not been demonstrated, noting that it is the defendants' burden under the controlling jurisprudence to prove "good cause." *See, e. g., Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 786-87 (3rd Cir. 1994); *Holland v. Summit Technology, Inc.,* 2001 WL 1132030 (E. D. La. 2001).

As to public disclosure, plaintiffs point out that their proposed protective order limits the use of confidential material to "litigation purposes only" and specifically states that it "shall not be used for ... publicity [or] marketing." As a matter of free speech, Blanchard contends that it should remain free to publicize its involvement in this case and all *public* events in the litigation. Blanchard further highlights that, according to its own proposed order, plaintiffs will be unable to and will not disclose information obtained in discovery that has been designated "confidential."

Plaintiffs submit that their previous publicity of non-confidential public material is insufficient to justify any conclusion that Blanchard will violate a court-sanctioned protective order. Blanchard observes that Barrick has engaged in publicity of its own, issuing press releases

6

and statements about this controversy and about Blanchard.  Nevertheless, plaintiffs point out

that they do not similarly presume, without evidence of any wrong-doing and, even before

discovery has commenced in earnest, that Barrick will violate the protective order executed by

the Court.

As to the existence or absence of "good cause," Blanchard highlights that Barrick has

already publicly disclosed the material terms of its gold trades with counter parties, including JP

Morgan.  Considering the foregoing disclosure, plaintiffs argue that any "heightened protection"

for these now public material terms of its gold trades is inappropriate.  Blanchard notes that

Barrick has made repeated disclosures in public filings, reports, including annual reports, and its

submissions to the Securities and Exchange Commission.  Copies of public pronouncements by

Barrick were attached to plaintiffs' opposition memorandum as plaintiffs' Exhibit "B."  Blanchard

further argues that because Barrick  publicly announced plans to liquidate its hedge book and

engage in no more hedging transactions, the defendants cannot now establish any good reason for

affording information relating to its hedge book transactions (or any other arguably confidential

materials) "heightened protection" and concomitant restricted access sought by the defendants

and that the ordinary "confidential" designation should serve the purpose of non-disclosure for all

protected information.

In summary, plaintiffs contend that, absent a foundation for the defendants' proposed

onerous provisions, the defendants' proposed order constitutes an attempt to control and monitor

every aspect of the plaintiffs' strategy and prosecution of the case.  Therefore, plaintiffs submit

that the Court should adopt plaintiffs' proposed protective order.

### III. ANALYSIS

### A. The Applicable Law Generally

A prerequisite to the issuance of a protective order governing discovery is a showing of "good cause." Fed. R. Civ. P. 26(c); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 (3rd Cir. 1994). Under Rule 26(c)(7) of the Federal Rules of Civil Procedure, a court may, upon a showing of good cause, issue an order protecting a trade secret or other confidential or commercially sensitive information from disclosure. The court may "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way." Fed. R. Civ. P. 26(c)(7).

"Good cause" exists when disclosure will result in a clearly defined and serious injury to the party seeking the protective order. *Pansy*, 23 F.3d at 786. The litigant seeking a protective order must articulate the injury with specificity. "Broad allegations of harm, unsubstantiated by specific examples," do not support a showing of good cause. The burden of justifying a protective order remains on the litigant seeking the order. In determining good cause, the court must balance the risk of injury without the protective order and the requesting party's need for information. The court has wide discretion in determining the scope of a protective order.

Both the plaintiffs and the defendants seek the entry of a protective order in this case, but disagree as to specific provisions necessary to preserve legitimate business/competitive interests of the respective parties. The order proposed by each allows each party to designate in good faith that information the designating party believes constitutes trade secrets, developmental

8

information, or other proprietary data of commercial value as subject to protection.  However, the

plaintiffs suggest a singular "confidential" designation and the defendants propose a two-tier

designation (*i.e.*, "confidential" and a "highly confidential" outside attorney's/expert's eyes only

designation).   Additionally, under the plaintiffs' proposed order, information or discovery

materials not designated "confidential" are not subject to the protective decree, whereas, the

defendants' proposed order, on its face, imposes various restrictions regarding the use of *all*

discovery materials produced in this litigation and requires the return or destruction of *all*

discovery materials upon completion of the case.

As to the appropriate scope of protection, the court in *Bayer AG and Miles, Inc. v. Barr

Laboratories, Inc.,* 162 F.R.D.  456 (S. D. N. Y. 1995) said it best:

> There are essentially three types of protective orders in terms of the amount of
> information covered.  The narrowest is a protective order covering specific,
> identified information.  *See, e.g., Pelligrino v. United States,* 1992 WL 84475 at
> *3 (protective order covering a single, specified audiotape).  With a narrow
> protective order the court usually reviews the protected material, so it is clear that
> "good cause" existed for the protective order.
>     At the other extreme is an "umbrella" protective order that designates all
> discovery as protected, without any review or determination of "good cause" by
> parties or the court.  "Umbrella" protective orders are disfavored, and on a motion
> for modification the burden generally will be on the party seeking protection to
> show good cause. *See Hayden,* 106 F. R. D. at 554 (burden of establishing need for
> continued protection is on person opposing the modification in "decisions
> involving 'umbrella' type orders that indiscriminately restrict access to all
> discovered documents."); *In re Agent Orange,* 104 F.R.D. at 570-571 (no "good
> cause" for original protective order that covered all discovery material).
>     Between those two extremes is a "blanket" protective order that permits
> the parties to protect documents that they believe in good faith contain trade
> secrets and other confidential commercial information.[2]  Such protective orders

---

[2]"While the terminology is not uniform throughout the case law, the Court follows
*Hayden* in using the term "umbrella" to refer to the disfavored protective order that covers all

are routinely agreed to by the parties and approved by the courts in commercial litigation, especially in cases between direct competitors. *"Blanket" protective orders are essential to the functioning of civil discovery.*

*Bayer AG,* 162 F.R.D. at 465 (emphasis added).

Bearing the above-discussed applicable law in mind, the Court now turns to the plaintiffs' and defendants' specific areas of disagreement..

### B. Disputed Provisions of the Parties' Respective Proposed Orders

### (1)    Limiting the Use of All Discovery to this Litigation
### Court Exhibit "A" Δ's ¶ 3/ Court Exhibit "B" P's ¶ 10(a)

Defendants' paragraph 3 addresses the concern limiting use of information gleaned during discovery to this particular case and no other. Defendants submit that this is a standard term of virtually every protective order. Plaintiffs comparable provision is set forth at paragraph 10(a) of their proposed order. Plaintiffs counter that it is apparent from their corresponding paragraph 10(a) that it is not their intention to use confidential information other than for the purpose of litigation and not for publicity or marketing. Plaintiffs point out that the real difference between the parties' proposals is that the defendants intend to restrict use of all discovery material to this particular case, while the plaintiffs seek the ability to use the information in related litigation involving the same parties (*i.e.,* a libel suit pending in a Canadian court involving Blanchard and Barrick). Plaintiff's submit that the libel suit will entail much of the same discovery and little purpose is served by forcing the parties to conduct voluminous discovery twice.

---

discovery information and the "blanket" to refer to a protective order that allows the parties to designate material they in good faith believe is commercially-sensitive for confidentiality protection." *Bayer AG,* 162 F.R.D. at 465 n. 14.

Moreover, the plaintiffs point out that what the defendant proposes is not an acceptable "blanket type" protective order, but rather the disfavored "umbrella type" covering all discovery materials. The defendants' proposal seeks to limit use and prevent public disclosure of "*all* material" not just discovery bearing a confidential designation.  Defendants protective order reads in pertinent part, to wit:  "<u>All</u> documents and discovery produced in this case shall be used solely for the purposes of <u>this</u> litigation." *See* Defendants' Order at para. 3 (emphasis added).

The Court finds that the defendants' position has merit regarding limiting disclosure to this particular litigation, but only insofar as it seeks to shield confidential documents and information.  However, insofar as the defendants' proposed order addresses *all* discovery, shielding it from public disclosure or restricting its use to this litigation, the defendants' position is without merit and not supported by either the applicable rules or the prevailing jurisprudence. Indeed, the objective should be to protect only material for which there is a clear and significant need for confidentiality. *See Manual for Complex Litigation (Third)*, at p. 69 § 21.432.  The protective order should  "provide that all assertedly confidential material disclosed (and appropriately identified, usually by a stamp) is presumptively protected unless challenged." *Id.* at p. 67.  By covering *all* discovery materials within the umbrella of protection, the defendants' provision, as presently confected, robs public documents of their public character.  Suffice it to say, the Court is not persuaded by the defendants' argument that *all* discovery should come within the umbrella of protection; rather only documents bearing a confidentiality designation should be covered by the protective order.  As to restricting the use of *confidential* material to *this* particular litigation, that issue is addressed below in the Court's resolution of the

11

disagreement regarding defendants' proposed paragraph 15(i).

   (2)   **Categories of Confidential Documents – Two Tiers**
         **Court Exhibit "A" Δ's ¶¶ 6, 7 and 18**

   Defendants' paragraphs 6, 7 and 18 address two categories of protected documents – *i.e.*,

a CONFIDENTIAL classification and a HIGHLY CONFIDENTIAL classification; highly

confidential documents are accorded restricted access, *i.e.*, to outside counsel and designated

experts.  There is no comparable provision in the plaintiffs' proposed protective order and the

plaintiffs object strenuously to any such "eyes only" designation for highly confidential,

proprietary documents.

   Defendants submit that, in antitrust, patent, trademark infringement and other such

litigation, such a dual tier designation is a standard component of protective orders and necessary

to address concerns about disclosure of highly confidential, proprietary information to

competitors.  It submits that such a dual tier designation in no way inhibits plaintiffs' ability to

litigate their claims. They further argue, as to the necessity of client competitors' review of highly

sensitive proprietary information, that it is inconceivable that plaintiffs' would prosecute this

action without retaining an outside expert to assist in their prosecution of the instant antitrust

suit.

   As aforestated, plaintiffs object to the dual tier designation and submit that there is no

valid reason to restrict a class of documents so as to curtail competitor clients' review of

confidential documents.  Whether proprietary or commercially sensitive, plaintiff submits that

the singular confidential designation, without restricting access by the clients employees together

with the parties agreement not to disclose same and to utilize the information for any purpose

12

other than litigation, adequately addresses the defendants' concerns.  In this regard, plaintiffs' remind the Court that the defendants bear the burden of proof of "good cause" with respect to the necessity of the measure of protection meted out by the proposed "highly confidential" designation.  Plaintiffs argue that such a dual tier designation is not "the standard" and that the defendants real goal in prohibiting certain documents from plaintiffs' view is to inhibit prosecution of this case by unfairly restricting their ability to confer with counsel and to synthesize crucial complex financial data, financial agreements or arrangements and their consequences.

Plaintiffs' counsel points out that it is essential to the prosecution of this case that he rely on his clients' superior understanding of the intricacies of the gold market and argues that his clients' input is essential to the prosecution of this particular antitrust claim.  Plaintiffs' counsel explained:  "[I]t was a plaintiff [the client] that carefully analyzed the gold market and Barrick's governmental filings and public statements and, through detailed study, was able to piece together the truth about defendants' manipulation of the gold industry, while others were not." *See* Plaintiffs' Opposition Memorandum.

As mentioned at the outset, plaintiffs' contention is that Barrick has now ceased engaging in hedging and there remains little or no "highly confidential" information to be shielded from the clients' eyes.  Considering the foregoing, the plaintiffs submit that the defendants have failed to demonstrate "good cause" for the "highly confidential" designation, and have failed to show any competitive disadvantage by disclosure of hedge book materials, *inter alia*,  to the plaintiffs.

13

Defendants reply that courts have explicitly recognized that competitive disadvantage is a type of harm cognizable under the Rule and that there is sufficient jurisprudential authority for restricting disclosure of "competitors" sales and marketing plans, financial forecasts, margin, pricing, strategies, and customer identities to only outside attorneys and experts.

In this case, defendants submit that the two-tiered classification system is necessary to protect defendants, including JP Morgan, from clearly defined and serious injuries, which would ensue if required to disclose to plaintiffs (their competitors) vital strategic business information, customer lists, customer agreements, etc., and provide competitors an opportunity to interfere with ongoing business operation. Defendants dispute plaintiffs' assertion that Barrick has already disclosed the terms of its hedging contracts to the public and submits that it has only identified the broad features of its hedging arrangements. Defendants further explain that many of the details and identities of its counter parties have not been made public and remain very confidential.   Barrick argues that the announcement of a change in its hedge policy does not automatically erase the highly confidential nature of certain business records detailing business strategies and relationships, which are ongoing. It submits that Barrick's board minutes reflecting company strategy are no less confidential on account of the changed hedge policy. JP Morgan argues that it continues to have ongoing business relationships with many parties, including gold producers and central banks, and the terms of those agreements (and many of its other business records) sought by the plaintiffs are not only confidential, but proprietary information.

The Court observes that, while such dual tier designation may not be commonplace in ordinary litigation, such restrictions are commonplace where parties are competitors as is the case

here.  The Manual for Complex Litigation specifically notes that "disclosure to clients may be prohibited where, for example, the information has commercial value and the parties are competitors;  alternatively, the order may (1) limit disclosure to named individuals not involved in the relevant corporate activity, (2) *create a special class of highly confidential documents that only attorneys and non-client experts may view,* (3) require particularized  record keeping of disclosures to client personnel, and (4) require individual undertakings by those receiving such information not to use it." *Manual for Complex Litigation, Third* § 21.432 n. 146 (italicized emphasis added).

In *In re Motorsports Merchandise Antitrust Litigation*, 1998 WL 128424 * 4 (N. D. Ga. March 20, 1998), an antitrust case filed pursuant to the Clayton Act, involving an alleged conspiracy to fix prices of souvenirs and merchandise sold at professional stock car races sanctioned by  NASCAR, the court addressed the matter of a highly confidential designation. *The In re Motorsports* court found that the defendants had the better argument, finding that the potential hardship to the plaintiffs was outweighed by the potential prejudice to the defendants and ordered entry of a protective order that included a "Highly Confidential" designation applicable to certain financial information.

In yet another antitrust case, *United States v. Dentsply International, Inc.*, 187 F.R.D. 152, 161-162. ( D. De. June 11, 1999), the court addressed the issue of access to confidential information by Dentsply's employees and its general counsel.  The plaintiffs argued against disclosure of competitors' sales and marketing plans, financial forecasts, margin, pricing, cost and customer information to Dentsply employees and in-house counsel.  Plaintiffs successfully

15

argued that, even if such information is correctly designated as confidential, the information is so sensitive that its disclosure or further disclosure would work a clearly defined and serious injury. Dentsply argued that it would be prejudiced if its general counsel cannot have access to such confidential information and maintained that barring access to confidential information is unfair because Dentsply's outside counsel relies on general counsel to direct the litigation, devise legal strategy and provide assistance. The Government countered that, as an officer of Dentsply, general counsel was involved in the company's business decisions, he could base future business decisions on information learned during discovery. Moreover, giving Dentsply employees access to highly sensitive commercial information would increase the risk of its inadvertent disclosure. The court barred in house counsel from viewing sensitive proprietary documents, since he had a very real involvement in competitive decision making. In so doing, the court determined that the Government had carried its burden of demonstrating that the risk of injury outweighed the need for disclosure to General Counsel, observing that there was an unacceptably high risk of either utilization or inadvertent disclosure. *See Dentsply*, 187 F.R.D. at 161-62; *see also Drexel Heritage Furnishings, Inc. v. Furniture USA, Inc.,* 200 F.R.D. 255 (M. D. N. C. April 18, 2001) (supplier lists disclosure limited to outside attorney's eyes only).

In *C. A. Muer Corp. v. Big River Fish Co.,* 1998 WL 4888007 * 3 (E. D. Pa. August 10, 1998), a trade mark infringement case, the court restricted access to confidential and proprietary information to attorneys and qualified experts only because providing the documents to Muer's competitors would provide it with vital information (marketing and financial ) and an opportunity to engage in underbidding goods and services, anticipatory expansion and to interfere

16

with business operations). *See also Safeflight Instrument Corporation v. Sundstrand Data Control, Inc.,* 682 F.Supp. 20, 21 (D. De. March 24, 1998). In *Safeflight, supra,* a patent case, the court found that the weight of judicial precedent did not favor Safeflight's argument against heightened protection and further recognized that proper safeguards should attend the disclosure of trade secrets. The *Safeflight* court sanctioned the utilization of an "attorney's eyes only" designation. As to the plaintiff's inability to view the documents, the Court suggested that the plaintiff might, at a future time, nominate a non-technical officer to make business choices regarding the economic merits of this litigation, rather than an officer who is also a working scientist of the corporation.

In summary, "[a]mple precedent exists for limiting disclosure of highly sensitive, confidential or proprietary information to outside attorneys and experts, particularly when there is some risk that a party might use the information or disseminate it to others who might employ it to gain a competitive advantage over the producing party." *Asch/Grossbardt, Inc. v. Asher Jewelry Co., Inc.,* 2003 WL 660883 * 2 (S. D. N. Y. February 28, 2003) (*citing Westside-Marrero Jeep Eagle, Inc. v. Chrysler Inc.,* 1998 WL 186728 *2 (E. D. La. April 17, 1998)). "In most cases, 'the key issue often is not whether the information will be disclosed, but under what conditions it should be disclosed.'" *Id.* (*quoting Drexel Heritage Furnishings Inc. v. Furniture USA, Inc.,* 200 F.R.D. 255, 260 (M. D. N. C. 2001)). In order to protect against any "predatory" practices, while still recognizing the broad scope of discovery in a federal action, the court required entry of a protective order that (1) limited access to customer lists to plaintiff's counsel on an "Attorney's Eyes Only" basis, (2) limited the number of copies of said information that

may be circulated among plaintiff's counsel, and (3) limited the use of said information for purposes of *the present litigation only. See id.* at ** 2-3 n. 2 (noting that the procedure was used in *Drexel Heritage, supra,* and *Liberty Folder v. Curtiss Anthony Corp.,* 90 F.R.D. 80, 82-83 (S. D. Oh. 1981)).

The Court is persuaded by the defendants' argument, written submissions and the controlling jurisprudence discussed above, that the defendants' interest in the confidentiality of its most highly commercially sensitive business and/or proprietary information outweighs any interest competitor plaintiffs have in securing its employees' ability to review this highly sensitive information. Moreover, whether designated "Confidential" or "Highly Confidential," all protected designation is subject to challenge.

This Court recognizes, as stated at the oral hearing of this matter that, it is simply postponing, rather than eliminating the need for close scrutiny of particular discovery materials to determine whether any classification is justified under the circumstances. The Court further observes that it is equally clear from the parties' submissions that even the "Confidential" designation as to certain discovery documents will be the subject of dispute. *See* Plaintiffs' Memorandum in Opposition at p. 5 n. 2. Nevertheless, the Court *trusts* that the parties and their able counsel will undertake the duty to designate only the material which they believe in *good faith* merits the level of protection assigned, thereby reducing the burden of a *voluminous* document-by-document adjudication and minimizing delay in the prosecution of this case. As to the dual-tier designation, the order shall specify, with as much particularity as possible, the categories of information subject to the respective designations.

18

### (3) Limiting Disclosure of Confidential Documents to this Litigation
### Court Exhibit "A" Δ's ¶ 15(i)/ Court Exhibit "B" P's ¶ 13(i),(ii), (v)

Defendants' paragraph 15(i) limits access to current attorneys who have made an appearance in this case.  Plaintiff's corresponding provision paragraph 13, allows access by any attorneys employed by law firms who are attorneys for the parties, in-house counsel employed by a party who are involved in litigation management, clerical/paralegal personnel employed by counsel or the parties and any consulting or testifying expert, provided that the expert has signed an agreement to be bound by the protective order, such executed agreement to be maintained by counsel.

Defendants submit that plaintiffs aim is to share confidential information with its counsel in other matters (*i.e.*, the Canadian libel lawsuit involving the same parties).  Defendants contend that this discovery "sharing" loophole is unreasonable and that the restriction of the utilization of confidential material to this litigation is a common feature designed to protect confidential, sensitive and proprietary material from disclosure to competitors and non-parties outside of the litigation. *See e. g., U. S. ex rel Stewart v. Louisiana Clinic,* 2002 U. Dist. LEXIS 24062 ** 19-20 (E. D. La. December 12, 2002) (disclosure limited to specific individuals including parties' counsel of record); *Cmedia, LLC v. Lifekey Healthcare, LLC,* 216 F.R.D. 387, 391 ( N. D. Texas)(disclosure restricted to attorneys involved in the litigation and independent experts).

Plaintiffs argue that counsel in the Canadian proceeding should be afforded access to confidential information to prevent the necessity of duplicate discovery.  Plaintiffs direct the Court's attention to the following cases: (1) *United States v. International Business Machines*

19

*Corporation (IBMC)*, 70 F.3d 700 (S. D. N. Y. 1976) (an antitrust case) in which the court held

that the movant failed to demonstrate good cause why the protective order should limit the

parties' use of documents to the specific litigation at hand; and (2) *Johnson Foils, Inc. v. Huyck*

*Corporation*, 61 F.R.D. 405, 410 (N. D. N. Y.) in which the court held that the defendant's order

unacceptably limited the use of information in foreign litigation of a closely related nature

involving essentially the same parties.   In their oral presentation, plaintiffs' counsel noted that

his clients may stipulate that the protective order entered by this Court will govern utilization of

the confidential materials in the ongoing Canadian libel action.

Defendants counter that Judge Berrigan dismissed Barrick's libel claim and contend that,

*vis a vis* the Canadian libel suit and this litigation, the nature of the two suits are far from

identical.

As to the plaintiffs' citation of *IBMC, supra*, the Court notes that the *IBMC* decision was

driven by the preliminary findings that (1) movant CIA's motion was tardy, lack of procedural

compliance being crucial in a case involving hundreds of nonparty deponents, and that, (2) in any

event, movant failed to demonstrate that the specific documents at issue were of a confidential

nature and failed to satisfactorily explain its failure to identify the documents that were worthy of

protection, thus failing to demonstrate good cause for the blanket protection sought. *See United*

*States v. IBMC*, 70 F.R.D. at 701-702.  The court observed:

> It is difficult to discern from CIA's papers the precise basis for its claim that a
> protective order should issue.  The court is forced to assume that CIA is
> contending either that: (1) although there may be nothing contained in the
> documents of a confidential nature, IBM may engage in commercial or legal
> activity directed to inflicting harm on CIA and should not be allowed to use
> discovered documents in support of that activity; or (2) although only some of the

documents are of a confidential nature all of the documents should be protected since "to sort and designate 'confidential' information would be time consuming, hazardous, and an open invitation to continuous controversy." Under either theory, however, CIA has failed to show good cause for the issuance of the order requested.

*Id.* at 702.

In *Wilk v. American Medical Association*, 635 F.2d 1295 (7th Cir. 1980) (Wisdom, J.), the Court noted that there was no suggestion that New York was anything but a bona fide litigant, who needs access for bona fide litigation purposes, and that comparison of the Wilk and New York complaints shows that much, if not most, of the Wilk discovery must be eventually discoverable in the New York action. The *Wilk* court observed that the "two complaints are founded on virtually identical allegations of nationwide conspiracy." *Wilk*, 635 F.2d at 1300. The one major difference between the two suits is that one included a claim for damages. *Id.* at 1301 n. 12. Most notably, at the outset, the *Wilk* court observed the following, to wit:

> A collateral litigant should not be permitted to exploit another's discovery in the since of instituting the collateral litigation simply as a device to obtain access to sealed information. *United States v. United Fruit*, 410 F.2d 553, 597 (5th Cir.) (*citing Johnson Foils, Inc. v. Huyck Corporation*, 61 F.R.D. 405 (N. D. N. Y 1973)); *Williams v. Johnson & Johnson*, 50 F.R.D. 31 (S. D. N. Y. 1970). This a corrollary of the principle that federal discovery may not be used merely to subvert limitations on discovery in another proceeding. *Campbell v. Eastland*, 307 F.2d 478 (5th Cir.), *cert. denied*, 371 U.S. 955 (1962). *See generally*, 8 Wright & Miller § 2040, at 291-95. From that principle, it also follows that a collateral litigant has no right to obtain discovery materials that are privileged or otherwise immune from eventual involuntary discovery in the collateral litigation. *Grady*, 597 F.2d at 597.

*Wilk*, 635 at 1300.

This Court has previously recognized that only confidential material may be properly accorded protected status under the Court-sanctioned protective decree. Thus, in that regard, the

Court finds plaintiffs' position has merit, *i.e.*, ordinary discovery may be utilized in other

litigation.  However, as to discovery materials bearing the "confidential" and/or "highly

confidential" designation, the Court finds the defendants' argument more persuasive under the

circumstances presented in this case.  Although the Canadian litigation was in fact spawned by the

instant litigation, the two lawsuits are not of sufficiently similar *nature* to allow use of protected

materials to-be-marshaled beyond the confines of this antitrust litigation in the Canadian

proceeding.  Sharing of bonafide protected information disclosed in this proceeding with

attorney's involved in the Canadian libel action, who are not attorneys of record in this case, will

not be permitted.  This Court cannot conceive of any good reason to complicate the task of the

soon-to-be challenged confidentiality designations by superimposing challenges driven by

attorneys  not involved this case, who are not subject to this Court's jurisdiction.

The Court recognizes that, even as amended herein, there are powerful incentives inherent

in the attorney-crafted protective order (1) for  the plaintiffs' to dispute literally every

confidentiality classification (so that confidential material may be utilized in the foreign

jurisdiction and elswhere) and (2) for the defendants to accord some level of protected status to

most, if not all, of the discovery material produced and to err on the side of the "highly

confidential" designation.  One court noted that "[j]udges sign off on protective orders obligingly,

both as a convenience to the party litigants and to assure administrative control of the case."

*Dentsply,* 187 F.R.D. at 154.  Considering the "daunting potential for disputes built into the

[competing] protective orders proffered" in the *Dentsply* case, the court included a "back-up"

private-sector mechanism to issue binding resolution of confidentiality classification disputes, the

expense of which was to be taxed as costs to the parties.  That having been said, the Court expects

that the parties and their respective counsel will exercise their "good faith" judgment in such a

fashion as to permit little or *no margin of error* in both classifying discovery documents as

protected information and in challenging the producing parties' classifications.  For that reason,

no such fall back mechanism has been suggested by the undersigned *at this juncture of the*

*proceedings*.

### (4)     Employees' Access to Confidential Documents
### Court Exhibit "A" Δ's ¶ 15(iv)/ Court Exhibit "B" P's ¶ 13(iv)

Defendants' paragraph 15(iv) limits access to information designated "Confidential" to

four employees of a party and requires that the employees given access sign an acknowledgment

and transmit it to the producing party, prior to viewing the protected discovery.  The

corresponding provision in plaintiffs' proposed order is set forth in paragraph 13(iv) and permits

employees or representatives of the parties access to protected information to the extent necessary

to assist in the litigation.  Plaintiffs' proposed order does not contemplate execution of any

agreement to abide by the protective order by employees or representatives of the parties.

Plaintiffs object to the arbitrary four employee limit, to forwarding the acknowledgment to

the producing party and to doing so in advance of the disclosure.  Defendants cite *In re*

*Application of Time, Inc*. 1999 U.S. Dist. LEXIS 18394 at * 11 (E. D. La. November 22, 1999)

(requiring individuals to whom confidential information is disclosed to sign an affidavit and file it

in the record and serve same on all other parties).

Plaintiffs contends that limiting disclosure to four employees, approved in advance by the

defendants, is an unprecedented, unwarranted and blatant attempt to impair plaintiffs' prosecution

23

of its case and that access by more than four employees is required.  Plaintiffs note that employees

are needed to assist in indexing, organizing and preparing the case for trial.  Plaintiffs point out

that there is no authority for restricting access by plaintiffs' employees, nor have they proved that

any such restriction is necessary in this case.  As to the defendants' requirement of preapproval of

those employees who will have access, in that defendants' paragraph 15(iv) requires transmission

of the Agreement to opposing counsel *before reviewing the Confidential Information,* plaintiff

submits that such provision essentially gives the defendants' veto power over who the plaintiff's

can consult for litigation purposes within their own companies and provides a roadmap of the

plaintiffs' investigation of the case.  Plaintiffs contend that providing the identity of its employees

engaged in the investigation and prosecution of the case enables defendants to hire private

investigation firms to depose and harass those employees and that the defendants have done so in

the past.

Plaintiffs urge the Court to adopt its proposed language because it is less restrictive and

more  reasonably limits access to the number of employees necessary to assist in litigation.

Additionally, without pre-approval and without the necessity of executing an Agreement, the

parties can conduct their respective investigations with the requisite independence and employees

are spared potential investigation and harassment.  In sum, plaintiffs' submit that its proposed

language is all that is necessary to assure confidentiality and yet it preserves the parties' respective

rights to strategize and litigate their cases as they, and not their opponents, see fit.

The Court agrees with the plaintiffs' argument that veto power and an arbitrary limit

appear to be extreme and unwarranted.  One party should not have veto power over the others

personnel assigned to assist in the litigation nor should it be able to restrict their ability to prepare

by restricting access to a certain number of employees.  This is particularly true in light of the

implementation of the dual-tier designation adopted at the defendants' behest.    However, the

defendants' position has merit in that employees, who view confidential information, should have

to execute the agreement as do others, including experts, who view the confidential documents.

As to serving opposing counsel with the aforesaid executed agreements, filing same *in camera*

will sufficiently protect the parties' respective interests.  With the adoption of the "Highly

Confidential" restriction, any restriction on client participation, other than as previously set forth

above, is not warranted.

### (5)    Disclosure of Confidential Information Limited to Deponents<br>Court Exhibit "A" Δ's ¶ 15 and 18/ Court Exhibit "B" P's ¶ 13(iv)

Defendants' paragraphs 15 and 18 limit access to "Confidential Information" to deponents

*during the course of a deposition*, instead of permitting *ex parte* disclosure to any "potential

witnesses."  Defendants contend that this prevents disclosure to a broad undefined spectrum of

possible witnesses.  Defendants submit that removal of these provisions from its order eliminates

the protections afforded and that, what plaintiff has proposed, is essentially a sieve.

Plaintiffs counter with their need to show confidential information to all potential

witnesses, including third parties, so as to determine whether such persons need be deposed.

Plaintiffs reiterate the need to conduct their investigation outside of the defendants' glare and

submit that they need to inquire about confidential information not merely from deponents during

depositions, but also of potential witnesses without the defendant knowing their every move.

Plaintiffs highlight the salutary effect of their proposed language, as it may serve to reduce the

number of depositions necessary and thus minimize the cost of their antitrust litigation.

Defendants position has merit with regard to potential witnesses. The protections afforded by this order would be elusive if counsel were permitted to discuss "confidential" and "highly confidential" documents and information with unsworn *possible* witnesses. There exists good cause to impose the restriction sought by the defendants relative to the discussion of confidential documents with deponents. Here, both the plaintiffs and the defendants have recognized the need to protect the bonafide sensitive nature of certain discovery materials. Permitting the disclosure of confidential and in some cases proprietary documents to possible witnesses, who may be competitors of one or more of the parties, works at cross-purposes with the effort expended to date in crafting the necessary protections. Nothing stated herein should be construed so as curtail the respective parties' investigation addressing all discovery materials, which are not accorded protection as contemplated by the protective order to be entered by the Court.

### (6)   Document Storage
### Court Exhibit "A" Δ's ¶ 17/ Court Exhibit "B" P ¶ 15

Defendants' paragraph 17 addresses their need to protect highly confidential information from disclosure to their competitors. Defendants suggest that the Court order the parties to maintain protected documents in the offices of counsel or in storage facilities and not at the clients' offices. Plaintiffs' proposed order contains no comparable storage restriction, but provides at paragraph 15 that confidential information shall be maintained in the strictest confidence by all parties and their counsel, which assumes that the documents will be maintained in secure offices and not available to persons not entitled to disclosure pursuant to the order.

Plaintiffs object to the defendants' storage restriction and explain that counsel may need to

26

retain some data in *protected* offices of his client.  Defendants counter that, given the proximity of the offices of Blanchard and its counsel (they occupy the same building), allowing the plaintiffs to retain defendants' confidential documents in its offices is unnecessary and creates the risk of disclosure beyond the *employee limit* chosen to have access.

Preliminarily, the Court notes that it has not adopted the arbitrary employee limit suggested by the defendants. The Court has been given no reason to doubt that the parties will, in keeping with the spirit and intent of the protections accorded to sensitive documents, utilize their employees only as necessary to review, study, chronicle, store and marshal exhibits during the course of this litigation and store confidential information so as to ensure protection from inadvertent disclosure

The Court finds that the plaintiff's proposal will adequately protect information and documents stamped "Confidential."  However, as to documents which are stamped "Highly Confidential" (*i.e.*, outside experts and attorney's eyes only), such information shall either be maintained in a secure location outside counsel's offices or some other secure storage facility, but not at the clients' offices.

   (7)    **Deposition Attendance**
          **Court Exhibit "A" Δ's ¶ 23**

Defendants paragraph 23 proposes to limit attendance at depositions utilizing Confidential Information to those who would otherwise have access to the information, whereas the plaintiffs' proposed order contains no such deposition attendance restriction.  Defendants submit that clients' unrestricted attendance at depositions would defeat the purpose of the protective order. *See In re Shell Oil Refinery*, 136 F.RD. 615 (E. D. La. 1991).

27

Plaintiffs' would have no objection to the defendant's proposal if the order adopted by the Court contains only one tier of confidentiality, *i.e.*, the confidential category and no "highly confidential." Nevertheless, the Court has previously determined that the two-tier structure is necessary to protect highly sensitive documents. As to the plaintiffs suggestion that the defendants proposal would result in their being excluded from most depositions, the Court is not persuaded.

Certainly, counsel will know in advance if "highly confidential" information will be discussed at a particular deposition. Obviously, the parties' clients cannot attend portions of the depositions wherein "highly confidential" documents are discussed. Even recognizing that this may generate a fair number of expedited telephone hearings, during the pendency of ongoing depositions, the Court cannot conclude that this is more trouble than its worth. There is a lot at stake in terms of potential competitive injury. Accordingly, the Court finds the defendants' proposed language to be the better approach. It is, however, expected that the parties will prepare for the depositions in advance and marshal "highly confidential" deposition exhibits and discussion thereof in such a manner as to cause as little disruption of the discovery depositions as possible. At the appropriate juncture of the deposition involving review and/or discussion of "highly confidential" documents, the clients can step out the room. Needless to say, the plaintiffs themselves may be required to produce some documents, which they believe in good faith fall into the "highly confidential" category; if any such documents are the subject of deposition testimony, the defendants will similarly be required to step out of the room at the appropriate juncture.

**(8)     Attorney Communication of Confidential Communication
          Court Exhibit "A" Δ's ¶ 27**

Defendants' paragraph 27 states that, in rendering advice and in otherwise communicating

with the client, the attorney shall not disclose Confidential Information to anyone not

appropriately specified in Paragraphs 15 and 18. Plaintiffs' objection is only applicable in the

context of a two-tier designation of confidentiality.

The Court finds that the language discussed above in paragraph 27 is appropriate in light

of the adoption of the two-tier designation.  This simply reiterates that "highly confidential"

discovery is not to be disclosed to clients at all.   If counsel were allowed to discuss such

information in rendering advice to the client, any protection of proprietary and/or highly sensitive

information would be illusory.  Paragraph 27 merely addresses the potential risk of leaking highly

confidential information in discussions with the client and any concomitant competitive injury.

**(9)     Destruction of Return of Discovery Documents
          Court Exhibit "A" Δ's ¶ 37/ Court Exhibit "B" P's ¶ 31**

Defendants' paragraph 37 requires destruction and/or return of _all_ discovery.  Plaintiffs

point out that there is no good reason for the plaintiffs or the defendants to return all discovery

and certainly not publicly available materials such as SEC filings. They do not contest returning

confidential materials, which are rightfully subject to the protective order. Plaintiffs highlight that,

in both cases cited by defendants,[3]  the protective orders issued subjected only confidential

documents to destruction or return.

---

[3]*Cmedia,* 216 F.R.D. at 391; *Videon Chevrolet, Inc. v. General Motors Corporation*, 1995
WL 395925 (E. D. Pa.).

The Court, having previously determined that the provisions of the protective order only properly governs the utilization and disposition of confidential information, finds the plaintiffs proposed language at paragraph 31 appropriate.

**(10)   Designation of Depositions as Confidential**
**Court Exhibit "A" Δ's  ¶ 9/ Court Exhibit "B" P's ¶ 10**

Defendants' paragraph 9 permits 30 days within which to designate depositions transcripts confidential, whereas the plaintiffs' at paragraph 7 allows only 10 days. The Court finds that twenty (20) days is sufficient.

**(11)   "Confidential" Information Obtained from Another Source**
**Court Exhibit "B" P's ¶¶ 18, 19**

Plaintiffs' paragraphs 18 and 19 allow "confidential" information to be used *if obtained other than through formal discovery* and *that confidential information may be disclosed to those who already had a copy of it.*  The defendants' proposed order contains no corresponding provisions.

The court finds this language particularly troublesome, if not a virtual "Pandora's box." Either documentary discovery materials merit the confidential designation or they do not. If the information is available from another source, then perhaps the non-producing parties have an argument that the confidentiality designation is misplaced. Both proposed protective orders provide a mechanism for challenge of the producing party's designation. Plaintiffs' proposed paragraphs 18 and 19 are, in effect, an alternative mechanism, which would serve to *de facto* declassify confidential documents without the necessity of a challenge, if the document is available from another source.

As previously mentioned, both plaintiffs and defendants have incorporated the generally sanctioned provisions regulating challenge of the producing party's designations. The approach embodied in plaintiffs' paragraphs 18 and 19 is unwieldy and unworkable. There shall be one route to take in order to invoke the Court's review and that is *via* challenge/objection, which method is uniformly approved by the courts and endorsed by the Manual for Complex Litigation. The Court is convinced that elevating "the cats out the bag" argument to mechanism for *de facto* declassification without review is unsound. The fact that the document is available from another source should be relegated to argument and factored into the analysis of any particular challenged designation.

## CONCLUSION

The parties have advised the Court both in written and oral argument that, other than the provisions discussed above, they are in substantial agreement with respect to provisions in the competing protective orders proffered. Perhaps this order and reasons will enable the plaintiffs and the defendants to submit a proposed protective order agreed to both in form and substance and consistent with this Court's rulings set forth above.

Accordingly,

**IT IS ORDERED** that the defendants' motion for protective order is GRANTED IN PART and DENIED IN PART, all as more specifically set forth above.

**IT IS FURTHER ORDERED** that, within fifteen (15) days of the entry of this order, the parties shall propose a joint protective order consistent with the Court's decision.

31

**OBJECTIONS**

Any objections to the foregoing must be: (1) specific, (2) in writing, and (3) served within

ten days after being served with a copy of this order and reasons.  28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 1(a), 6(b) and 72(b).

New Orleans, Louisiana, this   2nd   day April, 2004.

DANIEL E. KNOWLES, III
UNITED STATES MAGISTRATE JUDGE

32